UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

BRIAN J. WEBB                                                              PLAINTIFF

v.                               Civil No. 6:14-CV-06037-PKH-BAB

CAPTAIN KING, *et. al.*                                          DEFENDANTS

### REPORT AND RECOMMENDATION

This is a civil rights action filed by Plaintiff, Brian J. Webb, pursuant to the provisions of

42 U.S.C. § 1983.  Plaintiff proceeds *pro se* and *in forma pauperis*.  Pursuant to the provisions of

28 U.S.C. § 636(b)(1) and (3)(2011), the P. K. Holmes, III, Chief United States District Judge,

referred this case to the undersigned for the purpose of making a Report and Recommendation.

Currently before the Court is Defendants' Motion for Summary Judgment.  ECF No. 59.

A hearing was held on September 21, 2016, to allow the Plaintiff to give a sworn oral statement in

response to the Motion.[1]  ECF No. 64.  After careful consideration of the briefing and sworn

statement of the Plaintiff, the undersigned makes the following Report and Recommendation.

### 1.      BACKGROUND

Plaintiff is currently incarcerated in the Arkansas Department of Correction ("ADC")

Varner SuperMax Unit.  Plaintiff's claims center on his extraction from his cell on January 22,

2014, while incarcerated at the Ouachita River Unit.  Plaintiff alleges excessive use of force in

violation of the Eighth Amendment, unlawful use of restraints, and retaliatory conduct.  Plaintiff

alleges the use of the cell extraction team was unnecessary, and excessive force was used during

the extraction.  ECF No. 1, pp. 7-9.  After removal from the cell, Plaintiff was placed in a restraint

---

[1] As this was a sworn oral response to a Motion for Summary Judgment the Court did not allow cross examination of Plaintiff.

chair, and alleges he was kept in the chair for over five hours without a break, water or exercise in violation of policy. ECF No. 1, p. 10. Plaintiff was issued a disciplinary with the charges of failure to obey orders of staff, insolence to a staff member, using abusive or obscene language, and attempted assault on a staff member. Plaintiff plead not guilty to the failure to obey orders charge, and guilty to the other three charges. He was found guilty of these disciplinary charges. ECF No 1, pp. 14-17.

Plaintiff also makes reference to a due process claim based on denial of grievance procedures and a Fourteenth Amendment equal protection claim, although he does not include them as individual counts in his Complaint. ECF No. 1, pp. 6-7.

Plaintiff proceeds against all Defendants in both their official and personal capacity. ECF No. 1, p. 3. Plaintiff seeks declaratory and injunctive relief, a temporary restraining order, and compensatory and punitive damages. ECF No. 1, p. 13.

Defendants filed a Summary Judgment Motion on the basis of failure to exhaust administrative remedies on February 13, 2015. ECF No. 12. A Report and Recommendation was filed on June 3, 2015, finding a material question of fact remained as to whether Plaintiff had any available administrative remedies. ECF No. 40. This Report was adopted on August 10, 2015. ECF No. 45. Defendants filed the current Motion for Summary Judgment on August 8, 2016. ECF No. 59.

Plaintiff appeared by videoconference and gave a sworn statement in response to the Summary Judgment Motion on September 21, 2016. ECF No. 64.

Plaintiff testified as follows. Plaintiff was in the Residential Program Unit[2] (RPU) in a

---

[2] The RPU Unit is a residential treatment facility for mentally ill inmates in the ADC. ECF No. 61-5.

2

solitary cell.  He had just returned from the University of Arkansas for Medical Sciences (UAMS) hospital where he was taken after self-mutilation and a hunger strike.  For dinner, his tray contained cake, which he stated the inmates did not get very often.  Due to his recent hunger strike he could not finish his cake.  He asked a Newman, an inmate in the next cell if he thought he would be able to save it and eat it later.  Newman told him it would be okay.  An officer kept coming around and asking for him to surrender any food not eaten.  Plaintiff did not want to give up his cake, so he refused to do so.  He was tired and sleeping a lot.

A nurse came to his cell door and told him to stick his arm through the hole in the door so she could take his blood.  He refused to do so because it was unsanitary.  Inmates sometimes smeared feces in the cells, including the door hole.  They refused to take him out the cell to take his blood.  They tried to take blood several times.  Plaintiff testified he told the nurse that if they kept bothering him he would take his sutures out.

Officers kept coming by his cell and waking him up.  One of the officers came to the cell and asked if I was going to harm himself.  At the next chow period they told him they were not going to feed him unless he handed over his cake.  Plaintiff told them he was keeping the cake.

A mental health counselor came to his cell and asked him if he was going to harm himself.  Plaintiff testified he told them he was not, but he was trying to sleep.

An officer, a Captain or Major, asked him what was going on.  He told Plaintiff they were going to take his cake.

Plaintiff testified he was never asked to "catch the cuffs."  He saw the restraint chair, asked them why they brought it, and then the extraction team came into his cell.  He resisted verbally but never physically, and the officers started doing judo pressure points.  He said a lot of things he

3

should not have said, but they stripped him naked and strapped him into the chair.  He was kept in the chair for five or six hours, which is against ADC policy.  Plaintiff testified he was not allowed out of the chair for more than four hours.  Plaintiff stated the restraints were not released and he was not allowed to go to the restroom for five hours.  He just slept in the chair.  When he woke up, he asked the next shift sergeant if he could be let out of the chair.  He was told he would be allowed to do so if he would go back to his cell and lay down.

Plaintiff testified he had a discussion with Defendant King while he was in the chair.  King told him he had to use that force against him because of his previous history and past behavior.  Plaintiff thought this referred to a 2008 incident involving himself and King.  Plaintiff believed the whole chair incident was to show him that his past behavior would not be tolerated in this unit.

Plaintiff testified that prior to the extraction he did not refuse to follow any staff orders that day.  The only orders he did not follow were the orders to give up his cake and to have his blood drawn.

Plaintiff testified his only injuries from the extraction were some bruising and knots.  No broken bones or cuts or anything that needed medical care.  Plaintiff testified he did not physically resist, except to move his neck away from the pressure points.

Plaintiff testified he sued the officers other than King and McHan because they were part of the extraction team.  Plaintiff sued Defendant Guy because he was the active sergeant on that zone.  He was present either in the barracks or outside of the glass looking in during the extraction.

Plaintiff testified the Summary Judgment motion was full of false facts.  He was not combative, and did not say he was 95% certain he was going to harm himself.  He also noted mental health had cleared him, so there was not a continuous threat of self-harm.

4

Plaintiff admitted he did tell the nurse he was going to pull out his stitches.

Plaintiff testified he just wanted accountability to come from this lawsuit.  He did not care about the money.  He did not have any additional documents to submit.

## 2.    LEGAL STANDARD

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party."  *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,* 49 F.3d 399, 401 (8th Cir. 1995).  The moving party has the burden of showing the absence of a genuine issue of material fact and that they are entitled to judgment as a matter of law, but the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  The Court must view all evidence and inferences in a light most favorable to the nonmoving party.  *See McCleary v. ReliaStar Life Ins. Co.,* 682 F.3d 1116, 1119 (8th Cir. 2012).  However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## 3.    DISCUSSION

Defendants argue summary judgment should be granted on the following grounds: (1) sovereign immunity bars Plaintiff's official capacity claims; (2) Defendants are entitled to

qualified immunity for Plaintiff's individual capacity claims because no constitutional violations were committed.  ECF No. 59, p. 2.

### A.     Official Capacity Claims

Defendants are all employees of the Arkansas Department of Correction, a state agency. An official capacity claim against an ADC employee is essentially a claim against the State of Arkansas.  "The Eleventh Amendment bars suits against a State by citizens of that same State in federal court."  *Williams v. Missouri,* 973 F.2d 599, 599-600 (8th Cir. 1992) *(citing Papasan v. Allain,* 478 U.S. 265, 276, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)).  "This bar exists whether the relief sought is legal or equitable."  *Id.* (*quoting Papasan*, 478 U.S. at 276).  "Congress did not abrogate constitutional sovereign immunity when enacting the law that was to become section 1983."  *Burk v. Beene,* 948 F.2d 489, 493 (8th Cir. 1991) (*citing Quern v. Jordan,* 440 U.S. 332, 342 (1979)).  The State of Arkansas and its agencies have not consented to suit in federal court. ECF No. 60, pp. 3-4. Plaintiff's official capacity claims for monetary damages against the State of Arkansas are barred by sovereign immunity.

Defendants also correctly argue Plaintiff's claim for injunctive relief should be dismissed. Specifically, they argue Plaintiff is not entitled to injunctive relief because he has not shown any irreparable injury or threat of further injury.  ECF No. 60, p. 3.  They further argue Plaintiff's claim for injunctive relief is moot, as these claims occurred in the Ouachita River Unit and he is now housed in the Varner SuperMax Unit. ECF No. 60, p. 4.  As discussed below, Plaintiff did not suffer any constitutional violations.

Defendant are therefore entitled to judgment in their favor as a matter of law as to Plaintiff's official capacity claims, including his claims for injunctive relief.

**B.    Eighth Amendment Excessive Force**

Plaintiff disputes several facts concerning his cell extraction and placement in the restraint chair.  Specifically, he disputes (1) he told anyone he was 95% certain he was going to harm himself; (2) he was allowed to loosen his restraints and go to the restroom at the two hour mark in the restraint chair as required by ADC policy; (3) he was never told to "catch the cuffs" prior to the extraction team removing him from his cell; (4) mental health had cleared him, so there was not a continuous threat of harm; (5) he was not physically combative to the cell extraction team, he was only verbally combative.

Defendants argue Plaintiff was not subjected to any excessive force by any of the Defendants.  ECF No. 60, p. 5.  They further argue Plaintiff was extracted from the cell and placed in the restraint chair because Defendants "perceived a genuine threat of injury to Plaintiff."  ECF No. 60, p. 9.

Although Plaintiff disputes several facts, these facts are either not material to his excessive force claim, are contradicted by the record, or both.

"Whenever prison officials stand accused of using excessive physical force in violation of the Eighth Amendment, the 'core judicial inquiry' is whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Jones v. Shields*, 207 F.3d 491, 495 (8th Cir. 2000) (citing *Hudson v. McMillian*, 503 U.S. 1, 5 (1992).  Relevant factors to be considered for this inquiry include "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, . . .any efforts made to temper the severity of a forceful response," and the extent of injury to the inmate.  *Hudson*, 503 U.S. 7 (internal quotations omitted); *Jones*, 207

7

F.3d at 495.  "Not every malevolent touch by a prison guard gives rise to a federal cause of action."
*Id*.  While significant injury is not required, "some actual injury must be shown" and the extent of
inflicted pain considered.  *Id*.  "An inmate who complains of a 'push or shove' that causes no
discernible injury almost certainly fails to state a valid excessive force claim."  *Wilkins v. Gaddy*,
559 U.S. 34, 38 (2010).  "[U]nless it appears that the evidence, viewed in the light most favorable
to the plaintiff, will support a reliable inference of wantonness in the infliction of pain ... the case
should not go to the jury."  *Johnson v. Bi-State J. Ctr./Arkansas Dept. of Corrections*, 12 F.3d 133,
136 (8th Cir. 1993).

The two factors which most strongly support the use of the cell extraction team and restraint
chair in this case are the need for the application of force and the threat reasonably perceived by
the responsible officials.  There is no dispute as to the following contextual facts.  Plaintiff
attempted suicide on January 16, 2014, by slashing his right arm with a razor blade.  The injury
required him to be taken to emergency care at UAMS.  Plaintiff was returned to the ADC Hospital
and placed on Treatment Precaution.  On January 17, 2014. Plaintiff refused to eat or engage with
mental health staff.  On the evening of January 18, 2014, Plaintiff suffered a seizure, which medical
personnel attributed to his refusal of food, liquids, and medication.  On January 19, 2014, Plaintiff
stated he was on a hunger strike and refused his medications.  He was place on intravenous therapy
on January 20, 2014, so that he could receive medications and liquids.  ECF No. 61, pp. 4-5.

On January 21, 2014, Plaintiff met with mental health counselor Swearingen and
Defendant Captain King to discuss acceptable behavior.  It was determined that Plaintiff could be
returned to RPU from the ADC hospital.  The morning of January 22, 2014, Plaintiff informed
nursing staff he would take one, but not all of his medications.  Later that day, Plaintiff was moved

8

to RPU.  ECF No. 61, p. 5.  At RPU, Plaintiff refused to have his blood drawn.  ECF No. 61, p. 5.

Plaintiff threatened to pull his stitches out if they did not quit asking him to come to the door to

have his blood drawn.  ECF Nos. 61, p 5; 61-4, p. 22.

Plaintiff disputes that he told anyone that he was 95% certain that he was going to harm

himself.  Even if true, this fact is not material, given Plaintiff's other admitted statements and

actions.  At the hearing, Plaintiff testified they tried to take his blood several time and he refused.

He admitted that he told the nurse he would take his stitches out if they kept bothering him.  In his

deposition, Plaintiff testified he refused the blood draw, telling them "You guys keep messing with

me, I'll just pull my stitches out and you won't have to worry about anything."  ECF No. 61-4, p.

22.  Plaintiff also testified at his hearing that Defendants McHan and King were some of the

officers who kept coming to his cell and asking him if he was going to harm himself.  He kept

telling them to leave him alone, he just wanted to sleep.  ECF No. 61-4, p. 23.  At his hearing,

Plaintiff testified officers kept coming by his cell and waking him up.  One of them asked if he

was going to harm himself.  He testified a mental health counselor came by his cell and asked him

if he was going to harm himself.  He testified he told the counselor he was not, but he was trying

to sleep.  Plaintiff also testified he refused multiple orders to return his uneaten cake to officers

and refused at least one food tray.  In doing so, Plaintiff testified he told officers he just wanted to

sleep.  His repeated statements he told officers and the mental health counselor he just wanted to

sleep permits the inference that Plaintiff was laying on his bed and refusing to come to the door of

his cell.  He also testified that when told he would not get fed unless he turned over the uneaten

food, Plaintiff told them he was keeping the cake.  Thus, Plaintiff refused food only four days after

suffering a seizure, and two days after he was placed on intravenous therapy for his hunger strike.

A review of Plaintiff's Status Assignment Sheet indicated seven instances of self-mutilation in addition to the one he committed just prior to January 22, 2014.  ECF No. 61-1, pp. 8, 11, 14, 15, 16.  In light of his prison record of self-mutilation, Plaintiff provided more than sufficient testimony to show it was reasonable for officials to believe he was going to harm himself because he had refused multiple orders to permit his blood to be drawn, had threatened to pull his stitches out, and lay on his bed refusing to engage with officers, a mental health counselor, and at least one nurse.  Therefore, whether Plaintiff actually stated he was "95% likely to harm himself" is not material to the existence of reasonably perceived harm to Plaintiff and the need to extract him from his cell.

Plaintiff testified at his hearing that he was cleared by mental health, which meant there was no continuing threat of self-harm.  The record indicates Plaintiff was cleared to leave the ADC hospital unit and housed in RPU on January 21, 2014.  ECF No. 61, p. 5.  He was placed in RPU on Treatment Precaution on January 22, 2014.  ECF No. 61-1. p. 2.  Plaintiff also testified in his deposition that a mental health counselor, Chad Parsons, talked to him through the cell door just prior to the extraction team coming in.  Plaintiff testified Parsons cleared him on mental health levels because he stated "Guys, he's good.  Do what you've got to do."  He further stated Parsons had been asking if he meant to harm himself.  ECF No. 61-4, p. 24.  The affidavit of Defendant King indicated he sent Parsons to the cell.  He further states Parsons asked Plaintiff if he felt like harming himself and Plaintiff responded he would pull the stitches out to cause himself to bleed.  ECF No.  61-2, p. 4.  Taking Plaintiff's testimony as true, he provided testimony that he was cleared to be placed in a mental health unit on treatment precaution, and a mental health counselor saw him and asked if he was going to harm himself prior to the entry of the cell extraction team.

Neither of these statements permit the Court to make the inference that he had been given a clean bill of mental health and was unlikely to harm himself, particularly in light of his admitted statements, actions, and prior history of self-harm as discussed above.

Based on Plaintiff's testimony and the record, there are no material questions of fact in dispute that officials reasonably perceived a threat to Plaintiff's safety and well-being if he remained in the cell.

Based on Plaintiff's prison record and testimony, there is also no material question of material fact as to the existence of a legitimate threat to both Plaintiff and staff safety in extracting Plaintiff from his cell. The 2008 incident referred to in Plaintiff's Complaint involved Plaintiff, King, and several other officers. According to Plaintiff's deposition testimony, he was upset because the commissary window closed before he could place an order. He refused an order to catch cuffs. King was called to the site, and he told Plaintiff to "catch cuffs or go in the hole." King then pulled his Mace out and Plaintiff told him "Man, you Mace me and we're going to knock, man." King sprayed him, and Plaintiff started hitting King as a result. Plaintiff fought the other officers who arrived on the scene. Plaintiff characterized this as the "first time" he got in a fight with a prison officer. ECF No. 61-4, pp. 29-30. Defendant King's disciplinary report for the incident, as well as his affidavit for this case, indicate Plaintiff was not sprayed with pepper-spray until he started towards King with clenched fists. Four other officers were involved in trying to bring Plaintiff down and place restraints on him after he was sprayed. Plaintiff kicked Officer Morton in the face as they tried to place restraints on him. ECF Nos. 61-2, p. 2, 61-3, p. 1. Regardless of what action precipitated the pepper-spray, the Court notes Plaintiff's own testimony

and his disciplinary record for the 2008 incident indicated he fought five guards and injured one *after* he was sprayed with pepper-spray for failing to obey orders.

A review of Plaintiff's Status Assignment Sheet indicates Plaintiff injured staff on at least two other occasions aside from the 2008 incident with King. ECF No. 61-1, pp. 13, 25. There are six instances of battery committed against staff that do not include a notation of injury. ECF No. 61-1, pp. 6, 8, 11, 13, 23, 25. There are seven instances of attempted or threatened assault upon staff. ECF No. 61-1, pp. 1, 7, 8, 11, 23, 26. There are eight instances of throwing or ejecting fluids/excrement. ECF No. 61-1, pp. 13, 15, 18, 19, 23, 31. There are also multiple notations of assault and battery on other inmates or against unspecified targets throughout his record. Plaintiff further testified at both his hearing and deposition that King talked to him while he was in the chair, and told him they had to use force against him due to his previous history and past behavior. ECF No. 61-4, p. 28.

Based on this past history there is no material question of fact, a reasonable officer would believe that Plaintiff would not hesitate to fight with the guards they tried to compel him to do something he did not wish to do. Given his repeated refusal to engage with prison staff on this occasion, it was clear he did not wish to leave the cell. Further, given his wounded arm, it was in Plaintiff's best interests for him to be removed from the cell without engaging in a protracted physical fight. It was therefore reasonable for officials to perceive a threat to both Plaintiff and prison staff, and there is no material question of fact in dispute that there was a need to forcibly extract Plaintiff from his cell to mitigate that threat. *See Jones*, 207 F.3d at 496 ("summary applications of force are constitutionally permissible when prison security and order, or the safety of other inmates or officers, has been placed in jeopardy"); *Sheldon v. Pezley*, 49 F.3d 1312, 1316

12

(8th Cir. 1995) (use of "pain compliance hold" by extraction team to remove a recalcitrant inmate from the shower was not excessive force when done to "maintain the safety of the prison personnel or inmates"); *Campbell v. Sikes*, 169 F.3d 1353, 1376 (11th Cir. 1999) (use of L-shape restraint in addition to straightjacket not excessive force when "the urgent need for force was readily apparent" each time the L-shape restraint was applied and "the undisputed facts show Plaintiff posed a serious threat to herself and to others"); *Stannfil v. Talton*, 851 F.Supp.2d 1346, 1371 (E.D. Georgia March 29, 2012) (inmate's history of self-mutilation, coupled with his most recent cutting incident made it clear there was a need for some application of force).

At his hearing, Plaintiff testified he was kept in the chair for over four hours without the opportunity to loosen the restraints or go to the restroom, which is against ADC policy. This testimony is contradicted by the record. The restraint chair log indicates Plaintiff being checked every fifteen minutes, as required by ADC policy. ECF No. 61-11. Plaintiff is correct that inmates in the chair are to be permitted to flex their limbs and use the toilet if their behavior permits. A text box on the form states this policy, and another text box indicates the need for reauthorization every two hours for the inmate to remain in the chair. Spaces underneath these boxes are to be used for the initials of the officers who undertook these activities. ECF Nos. 61-11, 66-1. Plaintiff's restraint chair log has the initials CK at the two hour mark for flexing limbs and toilet time. Major McHan signed as the duty warden authorizing another two hours in the chair. An affidavit by McHan was provided at the Court's request after the hearing to provide further interpretation of the chair log. This affidavit identified the CK initials as belonging to Officer Clarence Kellogg. The affidavit further stated Kellogg would have faced disciplinary action for initialing that Plaintiff had been permitted to do so if he had not. There is no record of Kellogg

facing any disciplinary action for initialing the chair log incorrectly.  ECF No. 66-1.  Plaintiff's

deposition testimony also stated he was "out of it" and sleeping for much of his time in the chair.

ECF No. 61-4, p. 33.  This matches notations on the chair log indicating Plaintiff was sitting quietly

or sitting quietly with head down for most of the fifteen minute checks.  ECF No. 61-11.  Thus

there is no material question in dispute that Plaintiff was permitted to flex his limbs and use the

toilet at the two-hour mark in the chair.

   At his hearing, Plaintiff disputed he was ever told to "catch cuffs."  This testimony appears

to be contradicted, at least in part, by his deposition testimony, and is not material to the excessive

force analysis due to his failure to obey multiple orders from prison staff.  At his deposition, he

testified

> [t]he major and them would come down and were persistent upon me catching the
> cuffs and coming out of my cell.  It was kind of confusing though, because nobody
> ever asked me to catch no cuffs.  And we had no cuffs out, nobody ever opened my
> trap on the door."

As discussed above, however, Plaintiff testified he repeatedly refused to engage with staff,

permitting the inference he did not come to the door to receive cuffs.  A review of the extraction

video indicates the extraction team did not ask him to put on cuffs before coming into the cell.

However, the extraction team stated on the video Plaintiff had refused to come to the door and

submit to restraints prior to the assembly of the team.  ECF No. 62, disc J2.  Thus, there no material

question of fact that Plaintiff failed to obey multiple orders from prison staff on the day in question.

As discussed above, there were legitimate concerns for his safety and well-being if he remained in

his cell.  As was so aptly stated by the Seventh Circuit:

> Orders given must be obeyed. Inmates cannot be permitted to decide which orders
> they will obey, and when they will obey them.... Inmates are and must be required
> to obey orders. When an inmate refuse[s] to obey a proper order, he is attempting

to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger.

*Lewis v. Downey*, 581 F.3d 467, 476 (7th Cir. 2009); *see also Burns v. Eaton*, 752 F.3d 1136, 1140 (8th Cir. 2014) (pepper-spraying an inmate who disobeyed orders and engaged in aggressive acts of defiance was not a case where "a complete absence of a penological purpose" raised "the reasonable inference that the officers acted maliciously in an effort to cause harm"); *Caldwell v. Moore*, 968 F.2d 595, 601-02 (6th Cir. 1992) (when inmate had a propensity for violence and had engaged in prolonged hysteria in his cell, the use of stun gun and straitjacket to enforce orders for him to be quiet were not an Eighth Amendment violation). *Compare Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002) (no objective need for force when it was not apparent that inmate would have continued to disobey orders if they had been restated more clearly, and he was not posing a safety or security threat.)  Because Plaintiff admitted he failed to obey multiple orders from prison staff, including those related to his own health and safety, whether he ever saw cuffs placed in front of him is not material to the excessive force analysis.

Based on the Court's viewing of the cell extraction video (ECF No. 62, disc J1), all efforts were made to temper the severity of the force used during the cell extraction.  The team opened the door and rushed in with a shield, knocking Plaintiff down and back immediately.  After this initial rush to secure Plaintiff and prevent any prolonged physical struggle, they proceeded slowly and carefully to restrain him and then carry him to the chair.  During the removal and placement in the chair, Plaintiff alternated yelling threats and cursing with laughing and telling the team to do things "harder."  He appeared to be trying to physically resist as well, albeit without success. A medical staff member was present, and after Plaintiff initially refused medical attention, the medical staff member was eventually able to check his circulation and blood pressure.  ECF No.

62, disc J1.  At his hearing, Plaintiff testified he resisted verbally, but not physically, except to move his neck away from the pressure points.  In his deposition, Plaintiff testified they picked him up slowly, he "was pretty mad," and he resisted physically.  ECF No. 61-4, p. 28.  Thus, there is no material question of fact in dispute that Plaintiff engaged in physical resistance to his removal from the cell and placement in the chair, or that Defendants tempered the severity of the force as much as possible given Plaintiff's resistance and past history of violence to both himself and others.

The final factor to be considered is the extent of injury to the inmate.  Plaintiff testified in his hearing to suffering only some bruising and knots.  He testified he received no broken bones, or cuts, or anything that needed medical care.  Defendants argue the medical evidence establishes Plaintiff did not complain of any injuries and no injuries were observed on his body.  ECF No. 60, p. 10; 61, pp. 8-9.  Even taking Plaintiff's allegations of bruising and knots as true, he has alleged, at most, *de minimis* injuries.  Plaintiff has therefore not provided any summary judgment evidence that he suffered any actual injury sufficient to support an Eighth Amendment violation.  *See Wilkins*, 559 U.S. at 38 (2010) ("An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim."); *Irving v. Dormire*, 519 F.3d 441, 448 (8th Cir. 2008) ("Claims under the Eighth Amendment require a compensable injury to be greater than *de minimis*."); *Luong. v. Hatt*, 979 F. Supp. 481, 486 (N.D. Texas Sept. 11, 1997) (an actual physical injury is "an observable or diagnosable medical condition requiring treatment by a medical professional.  It is not a sore muscle, an aching back, a scratch, an abrasion, a bruise. . .")).

In light of the above circumstances, Plaintiff's disputed facts are not material to the excessive force analysis.  Defendants are therefore entitled to judgment in their favor as a matter of law.

### C.    Due Process or Access to Courts

Defendants argue that if Plaintiff is asserting a due process claim based on an alleged denial of access to the ADC's grievance procedure, it is without merit.  ECF No. 60, p. 11. They further argue he was not denied access to the courts, because he was able to file this lawsuit on March 13, 2014, less than two months after the January 22, 2014 cell extraction incident.  ECF No. 60, p. 13.

Defendant provided evidence that Plaintiff was aware of the grievance policy and availed himself of it on other occasions, including a few weeks after this incident on another issue.  ECF Nos. 60, pp. 11-12, 14-3.  Further, an inmate has no constitutional right to a grievance procedure. *Buckley v. Barlow*, 997 F.3d 494, 495 (8th Cir. 1993) (holding prison grievance process is a procedural right only, and as such "does not give rise to a protected liberty interest requiring the procedural protections envisioned by the fourteenth amendment"); *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991) ("When the claim underlying the administrative grievance involves a constitutional right, the prisoner's right to petition the government for redress is the right of access to the courts, which is not compromised by the prison's refusal to entertain his grievance.").  Thus, even if Plaintiff was denied access to a grievance procedure for the January 22, 2014, incident, as a matter of law, the denial does not impede his due process right of access to the courts.

Plaintiff was also able to write out and file this lawsuit concerning the January 22, 2014, incident on March 19, 2014.  "To prove a violation of the right of meaningful access to the courts, a prisoner must establish the state has not provided an opportunity to litigate a claim challenging

17

the prisoner's sentence or conditions of confinement in a court of law, which resulted in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim." *White v. Kautzky*, 494 F.3d 677, 680 (8th Cir. 2007). To prove actual injury, an inmate must "demonstrate that a nonfrivolous legal claim had been frustrated or was being impeded." *Id.* (quoting *Lewis v. Casey*, 518 U.S. 343, 353 (1996)). There are no disputed material facts concerning Plaintiff's due process or access to courts claim, and Defendant are entitled to judgment as a matter of law.

### D.      Equal Protection Claim

Plaintiff invokes the "14th Amendment due process equal protection clauses of the U.S. Constituion" in several places in his Complaint. ECF No. 1, pp. 6, 7, 11. Defendants argue it is not clear whether Plaintiff actually tried to raise an equal protection claim, but, he did not allege any facts to support a claim for it if he did. ECF No. 60, p. 13. I agree, he did not appear to allege an equal protection claim beyond generally referring to the 14th Amendment.

"The Equal Protection Clause generally requires the government to treat similarly situated people alike." *Klinger v. Dept. of Corrections*, 31 F.3d 727, 731 (8th Cir. 1994). "Thus, the first step in an equal protection case is determining whether the plaintiff has demonstrated that she was treated differently than others who were similarly situated to her." *Id.*

Plaintiff does not even allege any facts indicating he was treated differently than other inmates. Plaintiff provided no testimony in either his deposition or his summary judgment hearing indicating he was treated differently than other similarly situated inmates.

There are no disputed material facts concerning Plaintiff's equal protection claim, and Defendant are entitled to judgment as a matter of law on this claim.

18

### E.     Retaliation Claim

Plaintiff alleges Defendant King ordered him extracted from his cell and placed in the restraint chair in retaliation for a "physical confrontation" which occurred between Plaintiff and King in 2008.  Plaintiff alleges King told him he instructed the extraction team "to come full force and to not hold anything back.  Because he remembers what I did in 2008."  ECF No. 1 pp. 11-12.

Defendants argue his allegation is without merit because Plaintiff did not identify what constitutionally protected activity he was engaged in when the alleged retaliation occurred.  ECF No. 60, p. 14.  They further argue there was no adverse action taken against him.  ECF No. 60, p. 15.

To prevail on a § 1983 claim for retaliation a plaintiff "must prove that he engaged in protected activity and that defendants, to retaliate for the protected activity, took adverse action against [the plaintiff] that would chill a person of ordinary firmness from engaging in that activity." *Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007).  Because nearly every otherwise routine administrative decision may potentially be viewed as a retaliatory act, it has been recognized that "[r]etaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir. 1996). Further, the courts have recognized that prison officials must have broad administrative authority. *Graham,* 89 F.3d at 79. For this reason, it has been said that "courts must approach prisoner claims of retaliation with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir. 2001) (not every response to a prisoner's exercise of a constitutional right is actionable). *See also Turner v. Mull,* 784 F.3d 485 (8th Cir. 2015) *(*mere timing of events alone does not establish the requisite causal link*); Atkinson v. Bohn,* 91 F.3d 1127, 1129 (8th Cir.1996)(per curiam) (Speculative and conclusory allegations cannot support a retaliation claim).

Plaintiff failed to identify any constitutionally protected activities in either the 2008 incident or the January 22, 2014, incident which triggered the alleged retaliation. As discussed above, the 2008 incident referred to by Plaintiff involved Plaintiff attacking King and other officers after being pepper-sprayed for disobeying orders. One of officers was injured by being kicked in the face by Plaintiff. ECF No. 61-2. There is no constitutional right to disobey orders or attack prison staff. Defendants also correctly argue that there is no constitutional right to commit self-harm while in the custody of the ADC.

Because Plaintiff has not identified a constitutionally protected activity which triggered the alleged retaliation, there are no disputed material facts concerning Plaintiff's due process or access to courts claim, and Defendant are entitled to judgment as a matter of law. It is therefore not necessary to address Defendants' adverse action argument.

### F.      False Disciplinary Claim

Plaintiff alleges the disciplinary written against him for the January 22, 2014, incident was falsified in order to conceal the violations of his rights. ECF No. 1, p. 7.

Defendants argue Plaintiff offers no explanation for this claim, and has provided no facts or evidence to support it. They further argue he was found guilty of the infractions after a disciplinary hearing where he appeared and made a statement in his defense. There was therefore "some evidence" he committed the infractions. ECF No. 60, pp. 18-19.

Further, the filing of a false disciplinary charge against an inmate is not actionable under § 1983 unless it filed in retaliation for the inmate's exercise of a constitutional right. *Sprouse v. Babcock*, 870 F.2d 450, 452 (8th Cir. 1989). As discussed above, Plaintiff could not identify any constitutionally protected activity which triggered the alleged violation. Defendants are correct,

20

however, that claims of retaliation fail if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule." *See Hartsfield v. Nichols,* 511 F.3d 826, 829 (8th Cir. 2008). Therefore, the fact that Plaintiff was found guilty of the infractions defeats his false disciplinary action claim.

There are no disputed material facts concerning Plaintiff's false disciplinary claim, and Defendant are entitled to judgment as a matter of law.

### 4.    CONCLUSION

For the reasons stated, I recommend that Defendants' Motion for Summary Judgment (ECF No. 59) be **GRANTED** and Plaintiff's Complaint be dismissed with prejudice.

**The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED this 1st day of February 2017.**

/s/  Barry A. Bryant

HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE

21